**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Underdog Exchange DCM, Inc. and UDM, LLC d/b/a Underdog Predict,<br><br>*Plaintiffs*,<br><br>v.<br><br>ANDY WILSON, in his official capacity as Attorney General of Ohio; ANDROMEDA MORRISON, in her official capacity as Interim Executive Director of the Ohio Casino Control Commission; THOMAS J. STICKRATH, in his official capacity as Chair and Commissioner of the Ohio Casino Control Commission; PENELOPE R. CUNNINGHAM, in her official capacity as Vice Chair and Commissioner of the Ohio Casino Control Commission; SHEETAL BAJORIA, in her official capacity as Commissioner of the Ohio Casino Control Commission; SCOTT P. BORGEMENKE, in his official capacity as Commissioner of the Ohio Casino Control Commission; TRIFFON CALLOS, in his official capacity as Commissioner of the Ohio Casino Control Commission; KEITH CHENEY, in his official capacity as Commissioner of the Ohio Casino Control Commission; and CHRISTOPHER SMITHERMAN, in his official capacity as Commissioner of the Ohio Casino Control Commission,<br><br>*Defendants*. | Civil Action No. |

# COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Underdog Exchange DCM, Inc. and UDM, LLC d/b/a Underdog Predict ("Underdog"), by and through their undersigned counsel, bring this civil action for declaratory and injunctive relief, and allege as follows:

## INTRODUCTION

1. This action seeks to prevent the Attorney General of Ohio ("Attorney General") and the members and officials of the Ohio Casino Control Commission ("Casino Control Commission" or "Commission") (collectively, "Defendants") from unlawfully exercising jurisdiction over, regulating, or terminating Underdog's offering of lawful derivatives contracts on federally regulated markets.

2. Underdog operates a federally regulated designated contract market ("DCM") that lists event contracts for trading in interstate commerce. Underdog is also a federally registered futures commission merchant ("FCM") that solicits or accepts orders for the purchase or sale of event contracts traded on other DCMs. Through the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-27f, Congress vested the U.S. Commodity Futures Trading Commission ("CFTC") with sole regulatory authority over event contracts and other derivatives traded on designated contract markets, including deciding whether to prohibit certain event contracts—such as contracts related to gaming—as contrary (or not) to the public interest. *Id.* § 7a-2(c)(5)(C). According to the CEA and CFTC, "event contracts" are derivatives or swaps whose returns are "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency."[1]

[1] *See* Commodity Exchange Act, 7 U.S.C. § 1a(47); *Industry Oversight: Contracts & Products*, CFTC, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm. Examples of "event contracts" listed on the CFTC website include predicted corporate earnings, level of snowfall, and dollar value of damage caused by a hurricane. *Id.*

3. Pursuant to its DCM and FCM designations, Underdog offers event contracts in Ohio. Since the CFTC has "exclusive jurisdiction" to regulate trading on DCMs, including through FCMs, under the CEA, 7 U.S.C. §§ 1 *et seq.*, Underdog's compliance with CFTC approval procedures authorizes Underdog to offer and facilitate the trading of event contracts in Ohio. Nevertheless, Underdog now faces the imminent threat that Defendants will enforce Ohio's gambling and sports gaming statutes against its federally regulated market. Indeed, the Casino Control Commission has ordered KalshiEX LLC ("Kalshi"), a DCM, and two other CFTC-registered firms to stop offering sports-related event contracts in Ohio, has warned Ohio's sports gaming licensees that offering such contracts through a DCM or FCM, or associating with one that does—even outside Ohio—will jeopardize their licenses, and is now pursuing an administrative proceeding to fine Kalshi $5,000,000 for offering event contracts in Ohio.

4. Like Underdog, Kalshi is regulated by the CFTC. Even so, Defendants assert that, notwithstanding that the CFTC has exclusive jurisdiction to regulate DCMs and FCMs, event contracts traded on DCMs and through FCMs are "sports gaming," "wagers," and "bookmaking" subject to Ohio's Sports Gaming Act and Criminal Code. *See* Letter from Matthew T. Schuler, Exec. Dir., Ohio Casino Control Comm'n, to KalshiEX LLC at 1-2 (Mar. 31, 2025), *KalshiEX LLC v. Schuler*, No. 2:25-cv-01165 (S.D. Ohio Oct. 7, 2025), ECF No. 1-1 ("Kalshi C&D"); Complaint ¶¶ 43-45, *KalshiEX LLC v. Morrison*, No. 26 CV 006013 (Ohio Ct. Com. Pl., Franklin Cnty. June 29, 2026). Underdog therefore faces a real and imminent risk of enforcement, exposing it to civil penalties, potential criminal liability, and severe collateral consequences to its nationwide operations.

5. This risk has become particularly elevated recently. Defendants have escalated from cease-and-desist demands to seeking a $5,000,000 penalty from Kalshi, and they have not

agreed to defer that proceeding while the Sixth Circuit—which heard argument on July 30, 2026 in Kalshi's appeal from the denial of a preliminary injunction against Defendants—decides whether the CEA preempts Ohio's sports gaming laws.

6. Any enforcement action by Ohio would be meritless. Defendants' threat of enforcement is plainly inconsistent with Article VI, Clause 2, of the United States Constitution ("Supremacy Clause") and any enforcement efforts are therefore preempted. The CFTC has confirmed its position that Ohio's enforcement of its sports gaming laws against CFTC-designated contract markets violates the Supremacy Clause, telling the Sixth Circuit that "[s]tates cannot invade the CFTC's exclusive jurisdiction by re-characterizing swaps trading on DCMs as illegal gambling." Amicus Brief of U.S. Commodity Futures Trading Commission in Support of Appellant and in Support of Reversal at 1, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), ECF No. 31 ("CFTC Sixth Circuit Brief"). The CFTC has echoed this sentiment in each of the other amicus briefs, motions to intervene, emergency orders, and eight litigations it has filed across the country seeking to enforce its exclusive jurisdiction over derivatives trading on DCMs. *See infra* ¶¶ 67-68, 84-85.

7. Congress was explicit with its intent in enacting the CEA and giving the CFTC exclusive jurisdiction: because derivatives transactions are "affected with a national public interest," it was essential to create "a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the [CFTC]." 7 U.S.C. § 5. Accordingly, federal courts have long recognized that the CFTC's regulation of the national derivatives market is exclusive and preempts state involvement.[2] As the Third Circuit

[2] *See, e.g.*, *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003) (finding the CEA preempted California's Bucket Shop Law as applied to swaps exempted from coverage by the CEA); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 560, 563-64 (6th Cir. 1998) (noting that "[f]utures trading is

recently recognized, "the text of the Act preempts otherwise applicable state laws that purport to regulate . . . event contracts on CFTC-licensed [contract markets]." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026).

8. Consistent with Congress's original purpose, each amendment to the CEA over the past century has only reinforced its intent to maintain a uniform system. For instance, Congress expanded the CFTC's exclusive authority to cover new products, including swaps and contracts on "excluded commodities," and authorized the CFTC to review and prohibit certain event contracts if it determines that their trading would be contrary to "the public interest." 7 U.S.C. § 7a-2(c)(5)(C). Consistent with its role, the CFTC has adopted regulations regarding when and how an event contract may be suspended as contrary to the public interest and has published copious guidance on its approach, most recently issuing a Notice of Proposed Rulemaking on the topic. *See* 17 C.F.R. § 40.11; Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40). This Notice of Proposed Rulemaking would amend 17 C.F.R. § 40.11 to define the enumerated categories of event contracts, including "gaming," and the factors the CFTC may consider to determine whether an event contract is

---

conducted on exchanges designated as contract markets by the [CFTC], an independent agency created by Congress in 1974 to exercise *exclusive jurisdiction* over accounts, agreements, and transactions involving commodities futures contracts traded or executed on a contract market" and holding that a CEA regulation conflict preempted an Ohio statute that required payment to investors of any interest earned on collateral because it stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as manifested in the language, structure and underlying goals of the CEA" (emphasis added)); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992) (holding the CEA preempted state law whose application "would directly affect trading on or the operation of a futures market"); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (holding CEA "preempts the application of state law" to futures trading); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (affirming dismissal of a claim that trading in futures contracts violated Georgia gambling statute "on the ground that the Commodity Exchange Act preempts all state laws inconsistent with its provisions"); *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, No. 01 CIV. 11602(RWS), 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) (dismissing state law claims as preempted by the CEA because they "would directly affect 'trading on or the operation of a futures market'" (citation omitted)).

"contrary to the public interest." *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. at 35,859-61.

9. Underdog thus seeks declaratory and injunctive relief to protect its ability to operate federally regulated markets in Ohio. Any attempt by Ohio to regulate trading on DCMs (including through FCMs) is expressly preempted. Congress grants the CFTC "exclusive jurisdiction" to regulate trading on DCMs, including of options and "transactions involving swaps," such as event contracts. 7 U.S.C. § 2(a)(1)(A).

10. Ohio's regulation of trading on DCMs (including through FCMs) is also preempted because Congress has fully occupied the field of regulating federally registered DCMs, thereby preempting any overlapping state laws including state licensing or registration conditions that Ohio might purport to apply to Underdog.

11. Lastly, Ohio's regulation of trading on DCMs (including through FCMs) that would require Underdog to cease offering federally authorized event contracts is additionally preempted because it directly conflicts with the CEA's framework. Underdog cannot comply with both its federal law obligations and any purported obligations under Ohio law. Moreover, ceasing operations in Ohio would, among other things, undermine the CEA's goals of creating a uniform system of derivatives trading and violate CFTC guidance intended to promote uniform and fair markets. Indeed, it would cause the exact harm the CEA sought to prevent: traders could open a position outside of Ohio, travel to Ohio, and, while there, lose the ability to close or expand their existing position due to Ohio's application of its gaming regulations.

12. The threat of Defendants' enforcement of Ohio law poses a direct and imminent threat to Underdog's business and its users, and leaves Underdog with a "Hobson's choice" wherein both its options will cause irreparable harm. *Morales v. Trans World Airlines*, *Inc*., 504

U.S. 374, 381 (1992). Either Underdog can continue to operate in Ohio, "expos[ing] [itself] to potentially huge liability," including civil and criminal penalties, reputational damage, and competitive disadvantage, or it can "suffer the injury of obeying [Ohio's] law" despite the fact that it is preempted. *Id.*

13. In light of the imminent threat it faces as a result of Defendants' intention to wrongfully enforce Ohio law, Underdog brings this action to protect its right to offer event contracts pursuant to federal law and regulation, maintain the integrity of the federal regulatory framework, and avert imminent harm to its business operations.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the Constitution and the laws of the United States—specifically, whether Ohio law is preempted by the CEA as applied to Underdog's event contracts. And the Court has the power to declare the rights and legal relations of the parties under the Declaratory Judgment Act, 28 U.S.C. § 2201.

15. An actual controversy within the meaning of 28 U.S.C. § 2201(a) and Article III exists between Underdog and Defendants concerning whether federal law preempts Defendants from regulating, licensing, prohibiting, or bringing enforcement proceedings against Underdog's offering of CFTC-certified event contracts on its federally designated contract market and its intermediation of transactions in event contracts listed on other designated contract markets. That controversy is definite and concrete, touches the legal relations of parties having adverse legal

interests, and is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District. Underdog's event contracts are offered to, and traded by, persons throughout Ohio, including in this District, and Defendants' enforcement of Ohio's gambling and sports gaming laws against those contracts reaches and affects every such transaction. Venue is likewise proper in this Division, and at this divisional office, under N.D. Ohio Civ. R. 3.8, as Underdog's event contracts are offered to, and traded by, persons residing in the counties served by this divisional office, and the threatened enforcement described below reaches each such transaction.

17. The Eleventh Amendment does not bar this action. Underdog sues only state officials, in their official capacities, for prospective declaratory and injunctive relief to halt the threatened enforcement of state law that violates federal law. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002).

## PARTIES

18. Plaintiff Underdog Exchange DCM, Inc. is a Delaware corporation headquartered in Brooklyn, New York. It operates a DCM regulated by the CFTC under the CEA, where users can trade financial products, including event contracts.

19. Plaintiff UDM, LLC, doing business as Underdog Predict, is a Delaware limited liability company headquartered in Brooklyn, New York. It is an FCM regulated by the National

Futures Association ("NFA") and the CFTC under the CEA, offering event contracts traded on other CFTC-registered DCMs.

20. Defendant Andy Wilson is the Attorney General of Ohio and is sued in his official capacity. The Attorney General is "the chief law officer for the state." R.C. 109.02.

21. Defendant Andromeda Morrison is the Interim Executive Director of the Ohio Casino Control Commission and is sued in her official capacity.

22. Defendant Thomas J. Stickrath is Chair and Commissioner of the Ohio Casino Control Commission and is sued in his official capacity.

23. Defendant Penelope R. Cunningham is Vice Chair and Commissioner of the Ohio Casino Control Commission and is sued in her official capacity.

24. Defendant Sheetal Bajoria is a Commissioner of the Ohio Casino Control Commission and is sued in her official capacity.

25. Defendant Scott P. Borgemenke is a Commissioner of the Ohio Casino Control Commission and is sued in his official capacity.

26. Defendant Triffon Callos is a Commissioner of the Ohio Casino Control Commission and is sued in his official capacity.

27. Defendant Keith Cheney is a Commissioner of the Ohio Casino Control Commission and is sued in his official capacity.

28. Defendant Christopher Smitherman is a Commissioner of the Ohio Casino Control Commission and is sued in his official capacity.

29. Together, Defendants Attorney General Andy Wilson, Andromeda Morrison, Thomas J. Stickrath, Penelope R. Cunningham, Sheetal Bajoria, Scott P. Borgemenke, Triffon

Callos, Keith Cheney, and Christopher Smitherman would be responsible for enforcing the Ohio laws that are preempted by federal law.

## FACTUAL ALLEGATIONS

### A. Underdog Operates Federally Registered Marketplaces For Trading Event Contracts.

30. Underdog operates a federally regulated DCM that provides a marketplace for trading in derivatives products, including event contracts. Underdog is also a federally regulated FCM that allows traders to use its platform to trade event contracts listed on other CFTC-registered DCMs.

31. Underdog registered its FCM with the NFA and CFTC on January 9, 2026, confirming that its platform complied with the CEA.

32. The CFTC granted Aristotle Exchange DCM, Inc. its DCM designation on September 5, 2025, confirming that its market complied with the CEA. In March 2026, Underdog acquired Aristotle Exchange DCM, Inc. and its associated Derivatives Clearing Organization. Underdog announced the launch of its DCM on July 18, 2026.[3] On August 31, 2026, Aristotle Exchange DCM, Inc. filed a name change and is now named Underdog Exchange DCM, Inc.

33. From July 12, 2026 to September 2, 2026, pursuant to 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. §§ 40.2(a), (d), Underdog obtained CFTC certification for hundreds of event contracts.

34. On September 4, 2026, pursuant to its DCM designation and FCM designation, Underdog began offering its event contract listings to users located in Ohio.

---

3 Press Release, Underdog, Underdog Launches Prediction Markets on its own Exchange, (July 18, 2026), https://www.underdogsports.com/news/underdog-launches-prediction-markets-on-its-own-exchange.

### B. Congress Intentionally Vested the CFTC With Comprehensive and Exclusive Jurisdiction to Regulate Derivatives—Including Event Contracts—on Federally Registered Markets.

35. Derivatives are financial instruments used to allocate risk between counterparties. A derivative takes its value from something else—an asset, a rate, or a variable known as the underlier. The classic example is the grain futures contract, which permits buyers to mitigate the risk of volatility in agricultural markets by agreeing to buy or sell a specified amount of the crop at a fixed price on a future date. However, the underlier of a derivative can vary widely, allowing market participants to hedge against volatility across a wide array of tangible and intangible areas, including commodities like gold, financial benchmarks such as interest rates, and even weather or credit risk. Indeed, almost any type of risk can be hedged, as long as a CFTC-regulated market exists and a contract is available.

36. States have long viewed futures contracts with suspicion, equating trading on uncertain outcomes with gambling. Over a century ago, before the federal government began regulating derivatives markets, several states enacted outright bans on futures trading or subjected it to onerous restrictions under their gaming statutes. The resulting patchwork of often conflicting state regulation, poorly suited to facilitating a uniform national financial market, prompted Congress to take action.

37. First, Congress passed the 1922 Grain Futures Act, which required futures transactions for grain to be conducted on contract markets designated by the Secretary of Agriculture, centralizing trading on grain. Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998, 1000 (1922).

38. Then, in 1936, Congress strengthened this federal scheme by enacting the CEA. The CEA established a uniform federal framework for regulating futures markets, extended federal authority to a broader class of commodities and created the Commodity Exchange Authority, a

division within the Department of Agriculture charged with monitoring trading practices and prosecuting price manipulation. However, Congress did not yet establish an independent federal agency to comprehensively regulate the nation's derivatives markets. It also did not completely foreclose the application of state law, clarifying in the statute itself that the federal law would not impair the enforcement of applicable state laws. Commodity Exchange Act, Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936).

39. As derivatives markets became more sophisticated and integral to the national economy, Congress worried that, absent a single national regulator, "states . . . might step in to regulate the futures markets themselves," subjecting national exchanges to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156; *see also Leist*, 638 F.2d at 322 ("The federal government has been vitally concerned with trading in futures since 1922; indeed, the courts have held that § 2(a)(1) of the CEA preempts the application of state law."); *DGM Invs.*, 2002 WL 31356362, at *4 ("'Congress' intent to bring the markets under a uniform set of regulations' followed from a fear that states might attempt to regulate futures markets themselves and thus 'subject the national futures trading apparatus to conflicting regulatory demands.'" (citation omitted)); *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") ("different State laws would just lead to total chaos" (statement of Sen. Clark)). Similarly, the House Agriculture Committee stressed the need to bring "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 85 (1974).

40. Accordingly, in 1974, Congress enacted sweeping amendments to the CEA (the "1974 Act") and established the CFTC as an independent federal agency charged with

regulating the national derivatives markets. And, to address the threat posed by conflicting state regulation, Congress added a provision expressly granting the CFTC "exclusive jurisdiction" over derivatives trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). Congress also *eliminated* the 1936 provision providing that the CEA did not supersede or limit state jurisdiction "in order to assure that [f]ederal preemption [was] complete." 120 Cong. Rec. 30,464 (1974) (statements of Sen. Curtis, supported by Sen. Talmadge).

41. In subsequent amendments to the CEA, Congress continued to reinforce the importance of exclusive federal control over derivatives markets through a single agency—the CFTC. For instance, the 1992 Futures Trading Practices Act ("FTPA") expanded the CFTC's regulatory authority by permitting the CFTC to exempt certain financial instruments from the requirement that they be traded on a registered exchange. *See* 7 U.S.C. § 6(c). Congress also brought any such exempt financial instruments within the scope of the CFTC's exclusive authority by supplementing the existing express preemption provision, *id.* § 2, with a provision explicitly preempting "any State or local law that prohibits or regulates gaming" with respect to any agreement, contract, or transaction exempted from the exchange-trading requirement. *Id.* § 16(e)(2).

42. Similarly, in 2010, Congress amended the CEA through the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"). Once again, Congress expanded the CFTC's exclusive jurisdiction over derivatives markets. Congress added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction, *see id.* § 2(a)(1)(A), and expressly delegated authority to the CFTC and SEC to "further define" swaps as needed. 15 U.S.C. § 8302(d)(1). Congress also established a "Special Rule" expressly granting the CFTC discretionary authority to determine whether specific event contracts, including those

that reference terrorism, assassination, war, gaming, activity that is unlawful under federal or state law, or another similar activity, are "contrary to the public interest" and, if so, to prohibit them from trading on DCMs. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a). The Special Rule explicitly contemplated CFTC regulation of sports-related event contracts by giving the CFTC authority to prohibit event contracts related to "gaming" if those contracts are contrary to the public interest. The Rule does not require the CFTC to disallow event contracts referencing these underlying activities, but rather grants the agency the discretion to conduct a public interest review based on its own criteria.

43. Each iteration of the CEA has only reinforced Congress' intention to create a national market for derivatives products *despite* the concerns of individual states that derivatives markets should have remained under state control. Congress created a federal agency, vested it with exclusive jurisdiction, and centralized regulation over derivatives markets, granting the CFTC authority both to certify and prohibit derivatives products.

**C. The CEA and CFTC Regulations Establish a Comprehensive Federal Regulatory and Enforcement Framework for Trading Event Contracts.**

44. As a result of the CEA, the federal regulatory scheme governing the trading of derivatives, including event contracts, on DCMs and through FCMs is comprehensive and well-established.

45. To offer its derivatives for public trading, an entity must first be designated a contract market, or a DCM, by the CFTC. *See* 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The designation process is rigorous and requires the applicant to demonstrate compliance with the CEA's Core Principles as set out by the CFTC. *See* 17 C.F.R. § 38.3(a)(2); 7 U.S.C. § 7(d); *infra* § J.

46. Among other things, this requires the applicant to show it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. *See* 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

47. Once approved and granted designation, a DCM becomes subject to an expansive regulatory framework administered by the CFTC. DCMs have extensive continuing federal obligations, including prescriptive capital and liquidity requirements, participant eligibility standards, reporting obligations, recordkeeping mandates, and operational and governance standards—all directed toward compliance with the CEA's Core Principles. *See* 17 C.F.R. §§ 38.1101, 38.604, 38.1051(i), 38.950, 1.31, 38.450, 38.451; 7 U.S.C. § 7(d); *see generally* 17 C.F.R. pt. 38.

48. Because of the breadth and rigor of this regulatory framework, a DCM earning the CFTC's designation is accorded the status of a self-regulatory organization under federal law. DCMs are entrusted with front-line enforcement responsibilities, including establishing and enforcing market rules, detecting and preventing market abuses, and ensuring the integrity of all listed products and intermediaries. *See* 17 C.F.R. § 1.3; *id.* pt. 38.

49. In addition to its regulatory oversight authority, the CFTC possesses exclusive and comprehensive enforcement powers with respect to DCMs, their intermediaries, and market participants.

50. The CFTC's Division of Enforcement may initiate investigations and, with the approval of a majority of the Commission, bring enforcement actions in federal court or through administrative proceedings. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3. If the Division determines that a violation of the CEA has occurred, the CFTC may pursue civil monetary penalties, restitution, disgorgement, injunctive relief, cease-and-desist orders, and the suspension or revocation of registration and trading privileges. Criminal violations may be referred to the Department of Justice. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3.

51. Just like DCMs, FCMs are subject to comprehensive CFTC regulation. The CEA defines an FCM as "an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of a commodity for future delivery; a security futures product; a swap" or certain other transactions and "in or in connection with [those activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 1a(28). FCMs are required to register with the CFTC, *id*. § 6f; 17 C.F.R. § 3.10(c), and to comply with reporting requirements to the CFTC, *id*. §§ 1.10(b), 1.10(d), 17.00, disclosure requirements to the public, *id*. § 1.55, minimum financial requirements, *id*. §§ 1.12, 1.17, and recordkeeping requirements, *id*. §§ 1.14, 1.18. They must also "establish, maintain, and enforce" a risk management program and adhere to related reporting requirements. *Id*. §§ 1.11(c)(1), 1.15. Finally, FCMs must establish internal procedures to ensure compliance with trading standards, *id*.

§ 155.3, and adopt written policies and procedures to ensure compliance with conflict of interest regulations, *id*. § 1.71.

**D. Event Contracts Are Swaps Under the CEA.**

52. DCMs list event contracts for trading in interstate commerce. Event contracts are exchange-traded financial instruments, known as derivatives or swaps, and are defined broadly under the CEA as relating to any "occurrence, extent of an occurrence, or contingency," 7 U.S.C. § 7a-2(c)(5)(C)(i), that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *See* 7 U.S.C. § 1a(47) (defining "swap"), 7 U.S.C. § 7a-2(c)(5)(C)(i); § 1a(19)(iv); *see also Flaherty*, 172 F.4th at 226 ("'[S]wap' includes event contracts.").[4] FCMs can serve as an intermediary for trading swaps on DCMs.

53. The CEA defines "swap" broadly to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). It additionally includes as swaps any instrument "that is, or in the future becomes, commonly known to the trade as a swap." *Id*. § 1a(47)(A)(iv).

54. "[Event] contracts are not novel innovations." Brief for CFTC as Amicus Curiae Supporting Plaintiff at 7, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), ECF No. 31. Since 1992, CFTC-registered exchanges have been listing derivatives with payouts based on events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." *Id*. (quoting 73 Fed. Reg. 25669, 25671 (May 7, 2008)).

---

[4] Events themselves are an excluded commodity under the CEA. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

### E. Event Contracts Have Price Discovery Benefits, Predictive Value and Allow Businesses to Hedge Risk.

55. FCMs and DCM operators offering event contracts provide a neutral marketplace by matching counterparties to each other. They are not bookmakers. Unlike a casino, they do not set odds, assume directional risk, or take positions against their customers. Instead, they maintain a transparent marketplace with prices that reflect the supply and demand of a given position in real time.

56. Event contracts typically have a binary payoff structure dependent on the occurrence or non-occurrence of an event or contingency, represented by "yes" or "no" positions. A trader who takes an event contract with the "yes" position profits if the specified event or contingency occurs, while the "no" position purchaser profits if it does not. An active position may also be closed at a profit or loss prior to the occurrence or non-occurrence of the specified event or contingency.

57. The price of an event contract is determined by market forces, namely the supply and demand for entering into the "yes" and "no" positions of the contract. An event contract has a set expiration date, and the price of an event contract will fluctuate along with the market's perception of the likelihood of an event's occurrence until settling at a final price on the expiration date. Accordingly, event contracts have enormous predictive value because their price is set based on the market's aggregated expectations about whether the underlying event will occur.

58. Event contracts also allow businesses to hedge the risks associated with the occurrence or non-occurrence of a particular event, and thus act as a valuable risk management tool. For instance, sports-related event contracts can be used to hedge risk in many scenarios, including:

a. Media, broadcasting, and event ticketing companies facing financial exposure tied to viewership, which can fluctuate significantly depending whether there is a work stoppage or labor strike in a given sport, how competitive or interesting a game is, or how well a given team or franchise is playing;

b. Retailers selling team merchandise or apparel who see major swings in sales depending on whether a popular team advances or a particular player wins;

c. Travel and hospitality businesses exposed to spikes and falls in bookings dependent on whether a local team advances or hosts an event;

d. Restaurants and bars located around major arenas serving drastically different numbers of customers depending on whether a major event occurs,[5] or whether additional games in the NBA finals are played in a particular arena;

e. Advertising and marketing agencies with client campaigns tied to event outcomes, including guaranteed audience metrics, sponsor-activation thresholds, or promotional triggers linked to competition results;

f. Businesses running promotions tied to game results; and

g. Fantasy sports platforms and sports data providers relying on fan engagement and player performance.

59. This is not speculative. Companies such as Game Point Capital have already "arranged millions of dollars' worth of hedges through Kalshi."[6] Similarly, industry commentary

---

[5] *See, e.g.*, Devin Gannon, *NYPD Closes Area Around MSG for Knicks Game*, 6sqft N.Y.C. (June 10, 2026), https://www.6sqft.com/nypd-closes-area-around-msg-for-knicks-game; Charlie McKenna, *Boston PD to Shut Down Area Around TD Garden During Celtics NBA Finals Game*, Mass Live (June 17, 2024), https://www.masslive.com/news/2024/06/boston-pd-to-shut-down-area-around-td-garden-during-celtics-nba-finals-game.html.

[6] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.html;

has highlighted that event contracts will allow "small businesses that outright *depend on* a full 162-game MLB regular season schedule each year" to hedge their risks during a potential Major League Baseball ("MLB") lockout in 2027.[7] Indeed, these businesses can use Underdog to trade "yes" or "no" on an event contract regarding whether the MLB will have a "New [Collective Bargaining Agreement] Before Dec 2nd, 2026," i.e., whether a lockout will occur, and an event contract regarding whether "the first game of the 2027 MLB regular season [will] commence before March 25, 2027." Without the ability to hedge such risks using event contracts, "[l]ocal bars, food vendors, parking lots, souvenir shops, and even ticket scalpers could see their revenues catastrophically slide if the MLB regular season is canceled or shortened due to stalled negotiations."[8]

60. The viability of event contracts' hedging function depends on the efficiency of the markets and thus relies on speculation. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").

61. As the CFTC has explained, "[i]n addition to their information aggregation, price discovery, and price dissemination functions, prediction markets allow market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists" such as "'sporting events . . . that generate billions of dollars in economic activity and

---

Tarek Mansour (@mansourtarek_), X (Feb. 12, 2026, 3:38 P.M.), https://x.com/mansourtarek_/status/2022047766445535538?lang=en.

[7] *See* David Huber, Prediction Market Hedging Could Become Mainstream During 2027 MLB Negotiations, Deadspin (Aug. 7, 2026), https://deadspin.com/prediction-markets/legal-news/prediction-market-hedging-could-become-mainstream-during-2027-mlb-negotiations/ (emphasis in original); *see also* Joe Peta (@MagicRatSF), X (Aug. 4, 2026, 12:59 A.M.), https://x.com/MagicRatSF/status/2084866766732423467?s=46 (noting the extremity of the "binary economic impact for dozens of cities, hundreds of business and thousands of people" the outcome of Kalshi's market for how many MLB games will be played next season has, such that "[w]e should be cheering @Kalshi for its existence").

[8] Huber*, see supra* n.7.

materially affect both regional and national markets.'" Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 at 35,807-08 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40).

### F. The CFTC Has Exclusive and Discretionary Authority to Permit or Prohibit Event Contracts.

62. A registered DCM is permitted to list new derivatives contracts—including event contracts—for trading without obtaining the CFTC's prior approval of each individual contract. Instead, the DCM must certify to the CFTC that each new contract complies with applicable regulatory standards by filing a written certification prior to listing. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC then has a period of time to review and object to the submission before listing. If it fails to act during that period, the contract is deemed "effective" and may be listed for trading. *See* 7 U.S.C. § 7a-2(c). The CFTC may also conduct a discretionary review after the contract has been listed.

63. Under the CEA's "Special Rule," Congress expressly granted the CFTC discretionary authority to prohibit trading on specific event contracts, including those that reference gaming, if they are "contrary to the public interest." *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Congress did not authorize states to override or nullify federal authorization of event contracts by deeming them unlawful under state gambling law. *See* 17 C.F.R. § 40.11; 7 U.S.C. § 7a-2(c)(5)(C).

64. The CFTC has established procedures by which it may determine whether trading in a specific contract should be suspended and retains authority to initiate a formal review of any submitted contract under its own rules. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §§ 40.2, 40.11. This includes a 90-day discretionary review period, during which the CFTC may determine a contract is contrary to the public interest and order the DCM to suspend its trading. *See* 17 C.F.R.

§ 40.11(c). This mechanism ensures continued federal oversight while permitting market innovation to proceed without pre-approval delays for each new product.

65. On June 10, 2026, the CFTC issued a Notice of Proposed Rulemaking, proposing amendments to this discretionary review process. The proposed rule defines "gaming" and imposes three conditions that must occur before a contract may be deemed contrary to the public interest. *See* CFTC Release No. 9249-26. First, the agreements, contracts, transactions, or swaps must be based upon the occurrence, extent of an occurrence, or contingency. *Id.* Second, the agreements, contracts, transactions, or swaps must "involve" any of the enumerated activities (gaming, war, terrorism, assassination, and activities illegal under state and federal law). *Id.* Third, the CFTC must affirmatively determine that the agreements, contracts, transactions, or swaps are contrary to the public interest. *Id.*

**G. The CEA and the CFTC Have Confirmed the CFTC's Exclusive Authority Over Event Contracts Traded On DCMs and Through FCMs.**

66. To ensure uniformity in event contract markets and preserve the accuracy of event contract pricing, Congress granted the CFTC exclusive authority to regulate event contracts listed on DCMs and FCMs, including the event contracts Underdog offers directly and as an intermediary, as a subcategory of derivatives. *See* 7 U.S.C § 1a(47)(A)(ii), (iv), (vi); *supra* § B. Indeed, "event contracts" are specifically addressed in the CEA and in the Special Rule of the 2010 Dodd-Frank Act. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 7 U.S.C. § 7a-2(c)(5)(C); § 1a(19)(iv).

67. The CFTC has further confirmed its exclusive authority to regulate event contracts listed on DCMs and FCMs through litigation. The CFTC has brought actions against the states and state regulators in eight states, alleging that federal law preempts state law regulating event contracts traded on federally regulated markets. *See United States & CFTC v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026); *United States & CFTC v. Arizona*, No. 2:26-cv-2246 (D. Ariz.

Apr. 2, 2026); *United States & CFTC v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026); *United States & CFTC v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States & CFTC v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026); *United States & CFTC v. Minnesota*, No. 0:26-cv-02661 (D. Minn. May 19, 2026); *United States & CFTC v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026); *United States & CFTC v. Kentucky*, No. 3:26-cv-00049 (E.D. Ky. June 23, 2026). Additionally, the CFTC successfully moved to intervene in a lawsuit brought by Kalshi against state regulators in Rhode Island. *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026), ECF No. 19. The CFTC has also submitted briefs as an amicus curiae in Michigan, Nevada, Ohio and Tennessee. Brief for CFTC as Amicus Curiae Supporting Plaintiff, *N. Am. Derivatives Exch. Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), ECF No. 38; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *KalshiEX, LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), ECF No. 31; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *KalshiEX, LLC v. Orgel*, No. 26-5235 (6th Cir. June 24, 2026), ECF No. 63; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *QCX, LLC v. Nessel*, No. 26-1552 (6th Cir. Aug. 24, 2026), ECF No. 20.

68. The CFTC has also issued several notices, including Release No. 9194-26 (Mar. 12, 2026) and Prediction Markets Advisory (CFTC Letter No. 26-08), explaining that event contracts are "swaps" under the CEA. The CFTC's most recent Notice of Proposed Rulemaking, Release No. 9249-26 (June 10, 2026), once again confirmed that "Congress vested the Commission with 'exclusive jurisdiction' over 'transactions involving swaps'" and that event contracts are swaps. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 at 35,808-11 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40).

### H. Ohio Extensively Regulates Gambling and Sports Gaming.

69. Defendants have told the Sixth Circuit that "[g]ambling regulation falls within the States' traditional police powers," that Ohio has restricted gambling since before statehood, and that today "Ohio comprehensively regulates gambling activities." Brief of Defendants-Appellees at 4-5, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. June 4, 2026), ECF No. 36. The Ohio Constitution prohibits lotteries and casino gaming except as it authorizes. Ohio Const. art. XV, § 6. The Criminal Code makes gambling a crime, R.C. Chapter 2915, and since 2022 sports gaming may be offered only by licensees of the Casino Control Commission under Chapter 3775 of the Revised Code (the "Sports Gaming Act").

70. Under Ohio law, the Attorney General is "the chief law officer for the state." R.C. 109.02. The Attorney General "has a civil cause of action to restrain any violation of" the Sports Gaming Act, and "[u]pon the request of the commission or its executive director, the attorney general shall commence and prosecute such an action to completion." R.C. 3775.02(K)(1). The Attorney General may also sue to abate any place or "internet web site" that Ohio law declares a nuisance. R.C. 3767.03; *see* R.C. 3775.99(B)(9).

71. The Casino Control Commission has "jurisdiction over all persons conducting or participating in the conduct of sports gaming," "including the authority to license, regulate, investigate, and penalize those persons." R.C. 3775.02(A). In an adjudication under Chapter 119 of the Revised Code, the Commission may "[p]enalize or fine any sports gaming licensee, applicant for a sports gaming license, or other person who is subject to the commission's jurisdiction," R.C. 3775.02(H)(1)(a), and it may compel testimony, "issue subpoenas compelling the attendance of witnesses and the production of any papers, books, and accounts," and take depositions, R.C. 3772.04(D)(1). The Commission's gaming agents are "law enforcement

officers" with authority over "gambling offenses as defined in section 2915.01 of the Revised Code." R.C. 3772.03(F).

72. Ohio's Criminal Code defines a "bet" as "the hazarding of anything of value upon the result of an event, undertaking, or contingency, but does not include a bona fide business risk," and "bookmaking" as "the business of receiving or paying off bets." R.C. 2915.01(A), (B). It prohibits engaging in bookmaking or "knowingly engag[ing] in conduct that facilitates bookmaking," and establishing, promoting, or operating "any scheme of chance." R.C. 2915.02(A)(1), (2). Gambling is a misdemeanor of the first degree and, for a repeat offender, a felony of the fifth degree, R.C. 2915.02(K), and premises used for gambling are a nuisance subject to abatement, R.C. 2915.03(C). The Criminal Code "does not prohibit conduct in connection with gambling expressly permitted by law." R.C. 2915.02(C).

73. The Sports Gaming Act defines "sports gaming" as "the business of accepting wagers on sporting events," R.C. 3775.01(O)(1), and a "wager" as "to risk a sum of money or thing of value on an uncertain occurrence," R.C. 3775.01(DD). "Sports gaming" includes "any system or method of wagering on sporting events that the Ohio casino control commission approves, including exchange wagering, parlays, spreads, over-under, moneyline, . . . [and] proposition bets." R.C. 3775.01(O)(2). "[N]o person shall operate, conduct, or assist in operating or conducting sports gaming in this state without first obtaining an appropriate sports gaming license from the Ohio casino control commission." R.C. 3775.03(A)(1). Online sports gaming may be offered only by a licensed "type A sports gaming proprietor" or a "mobile management services provider" operating under contract with one, R.C. 3775.01(I), 3775.05, and a licensee may accept online wagers only "from individuals who are at least twenty-one years of age and who are physically located in this state," using "location based technology" to exclude everyone

else, R.C. 3775.11(A). Operating sports gaming "in a manner other than the manner required under" the Act is a felony, and any "internet web site" so used "constitute[s] a nuisance subject to abatement under Chapter 3767. of the Revised Code." R.C. 3775.99(B)(9).

74. Ohio's licensing regime is built for sportsbooks, not federally designated exchanges. The Commission may license no more than 25 type A sports gaming proprietors, R.C. 3775.04(A)(2)(a), must "give preference to applicants that are professional sports organizations, casino operators, or video lottery sales agents," R.C. 3775.041(A), and may license as a type A proprietor only an entity that operates a retail sports gaming facility or "maintain[s] at least one operational place of business in this state at which the sports gaming proprietor regularly maintains multiple employees," R.C. 3775.04(A)(3). Any other company may participate in online sports gaming only as a "mobile management services provider" that operates "on behalf of" a type A proprietor, under a Commission-approved contract, and "only in accordance with" the Act and the Commission's rules. R.C. 3775.01(G)(1), 3775.05(A)(3), (D). By the Commission's own account, 21 of the 25 type A licenses have already been issued. Memorandum in Opposition to Motion for Preliminary Injunction at 7 n.1, *KalshiEX LLC v. Morrison*, No. 26 CV 006013 (Ohio Ct. Com. Pl., Franklin Cnty. Aug. 14, 2026).

**I. Defendants Have Enforced and Will Enforce Ohio Law Against CFTC-Regulated Prediction Markets For Offering Event Contracts in Ohio.**

75. On March 31, 2025, roughly two months after Kalshi listed its first sports-related event contracts, the Casino Control Commission issued cease-and-desist letters to Kalshi, Robinhood Derivatives, LLC ("Robinhood," a CFTC-registered FCM), and Crypto.com. The letter to Kalshi took the position that Kalshi was operating an "unlicensed sportsbook" and "facilitating bookmaking" in violation of Ohio civil and criminal law and demanded that Kalshi

"immediately cease offering these sports wagering products unlawfully in Ohio."[9] Kalshi C&D at 1. The Commission demanded written certification of compliance by April 14, 2025, and warned that noncompliance "may result in the Commission pursuing all legal remedies and actions against Kalshi, including, but not limited to, administrative, civil, or criminal sanctions pursuant to R.C. Chapters 2915 and 3775." *Id.* at 2.

76. On August 25, 2025, the Commission sent a letter to Ohio's sports gaming licensees declaring that companies offering sporting event contracts "are operating online sports gaming," and that offering such contracts "directly or indirectly through a DCM or FCM – outside of the four corners of an existing sporting gaming license in Ohio – constitutes unlawful and unlicensed sports gaming." Letter from Matthew T. Schuler, Exec. Dir., Ohio Casino Control Comm'n, to Ohio Sports Gaming Licensees at 1 & n.1 (Aug. 25, 2025), *KalshiEX LLC v. Schuler*, No. 2:25-cv-01165 (S.D. Ohio Nov. 7, 2025), ECF No. 31-1, Exhibit A ("Licensee Letter"). The Commission warned that a licensee that offers such contracts "through their own DCM or FCM (or those under common ownership or operated by a related entity)," or that "associate[s], coordinate[s], or otherwise partner[s] directly or indirectly with" such a company, will have that choice weighed "as it evaluates the continued suitability of a sports gaming licensee . . . to maintain a license," and added that geofencing Ohio "may not alleviate the suitability concern." *Id.* at 2.

77. On October 6, 2025, after months of correspondence, the Commission informed Kalshi that it was "unpersuaded that Ohio law is preempted by federal law as Kalshi contends," that if "Kalshi chooses to continue to offer unlicensed and unregulated sports gaming in the form of sporting event contracts within Ohio, Kalshi will be violating Ohio law," and that unless Kalshi

[9] *See Ohio Casino Control Commission Issues Cease & Desist to Three Companies*, 13abc (Mar. 31, 2025), https://www.13abc.com/2025/03/31/ohio-casino-control-commission-issues-cease-desist-three-companies/ (quoting then-Executive Director Matthew Schuler: "Purchasing a contract based on which team a person thinks will win a sporting event is no different than placing a bet through a traditional sportsbook.").

complied "by no later than October 20, 2025," "the Commission will be forced to address such violation of law directly." Letter from Ohio Casino Control Comm'n to KalshiEX LLC at 1-2 (Oct. 6, 2025), *KalshiEX LLC v. Schuler*, No. 2:25-cv-01165 (S.D. Ohio Oct. 7, 2025), ECF No. 1-8 ("Oct. 6 Letter"). The Commission declined to withdraw the Licensee Letter, which it described as reflecting "an objective view of existing law and the nature of gaming regulation in Ohio." *Id.* at 1-2.

78. On October 7, 2025, Kalshi filed a lawsuit in the United States District Court for the Southern District of Ohio against the Commission, its Executive Director and members, and the Attorney General, seeking to enjoin them from enforcing Ohio's gambling and sports gaming laws against its federally regulated DCM on the basis that such enforcement is preempted by the CEA. *See* Complaint, *KalshiEX LLC v. Schuler*, No. 2:25-cv-01165 (S.D. Ohio Oct. 7, 2025), ECF No. 1. On March 9, 2026, that court denied Kalshi's motion for a preliminary injunction, and Kalshi appealed. *KalshiEX LLC v. Schuler*, No. 2:25-cv-01165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026), *appeal docketed*, No. 26-3196 (6th Cir. Mar. 11, 2026). The Sixth Circuit declined to enjoin Defendants pending appeal but expedited the appeal, observing that the "split of authorities leaves no doubt that Kalshi has raised serious questions on the merits" and that it did "not dispute that Kalshi will face potentially irreparable harm without an injunction" because it "likely could not recover its costs from Ohio even if successful in this litigation." *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, slip op. at 7, 14 (6th Cir. Apr. 24, 2026). The appeal was argued on July 30, 2026, together with Tennessee's appeal in *KalshiEX LLC v. Orgel*, No. 26-5235 (6th Cir.), and remains pending.

79. Rather than await the Sixth Circuit's decision, the Commission escalated. On April 14, 2026, it served Kalshi with a Notice of Intent to Impose a Penalty or Fine for Operating or

Conducting Unlicensed Sports Gaming in Ohio ("Notice"), asserting that "[f]rom approximately January 2025 through the date of this Notice, Kalshi has operated or conducted sports gaming in Ohio without a license through its online platform and its mobile application," in violation of R.C. 3775.03(A)(1), and that Kalshi had engaged in conduct "that undermines the integrity, or public confidence in, sports gaming in Ohio." Notice at 2, 4, *In re KalshiEX LLC*, Case No. 2026-SGR-001 (Ohio Casino Control Comm'n Apr. 14, 2026) ("Notice"); *see also* Complaint ¶¶ 42-44, *KalshiEX LLC v. Morrison*, No. 26 CV 006013 (Ohio Ct. Com. Pl., Franklin Cnty. June 29, 2026). The Notice seeks "a monetary fine and/or civil penalty in [the] amount of $5,000,000 against Kalshi for operating or conducting sports gaming in Ohio without a license issued by the Commission since approximately January 2025." Notice at 4. The Commission explained that "Kalshi's refusal to stop offering sports gaming in Ohio necessitated the Commission to take action to uphold the requirements of Ohio law."[10]

80. The administrative proceeding is moving forward: Kalshi requested a hearing, the Commission appointed a hearing examiner, and Defendants have not agreed to stay the proceeding while the preemption question is decided. Complaint ¶ 46, *KalshiEX LLC v. Morrison*, No. 26 CV 006013 (Ohio Ct. Com. Pl., Franklin Cnty. June 29, 2026); Motion for Preliminary Injunction at 2, *KalshiEX LLC v. Morrison*, No. 26 CV 006013 (Ohio Ct. Com. Pl., Franklin Cnty. July 20, 2026). In opposing Kalshi's state-court motion to enjoin the proceeding, the Commission described Kalshi as having "flouted" Ohio's sports gaming laws since January 2025. Memorandum in Opposition to Motion for Preliminary Injunction at 1, *KalshiEX LLC v. Morrison*,

[10] *See* Ohio Casino Control Comm'n Statement (Apr. 14, 2026), *quoted in Ohio Fines Kalshi $5 Million for Unlicensed Sports Betting Market*, WCPO (Apr. 14, 2026), https://www.wcpo.com/news/state/state-ohio/ohio-fines-kalshi-5-million-for-unlicensed-sports-betting-market ("Kalshi's refusal to stop offering sports gaming in Ohio necessitated the Commission to take action to uphold the requirements of Ohio law.").

No. 26 CV 006013 (Ohio Ct. Com. Pl., Franklin Cnty. Aug. 14, 2026). The state court will hear Kalshi's motion on September 29, 2026.

81. Nor is Defendants' theory limited to DCMs. The Commission's cease-and-desist demand to Robinhood, an FCM, and its warning to licensees against partnering with any "DCM or FCM"—including "any other entity that connects patrons to sporting event contracts," Licensee Letter at 2 n.3—confirm that Defendants' theory reaches intermediaries like Underdog Predict as well.

82. The Attorney General, for his part, has led the States' effort to defeat CEA preemption in the courts and before the CFTC. Ohio led or co-led the multistate amicus briefs urging the Third, Fourth, and Ninth Circuits and the Massachusetts Supreme Judicial Court to hold that States may enforce their gambling laws against CFTC-designated contract markets, *see, e.g.*, Brief of Amici Curiae of Ohio, New Jersey, 37 Other States, and the District of Columbia, *KalshiEX LLC v. Assad*, Nos. 25-7187, 25-7516, 25-7831 (9th Cir. Mar. 10, 2026); Brief of Amici Curiae of Nevada, Ohio, 35 Other States, and the District of Columbia, *Commonwealth v. KalshiEX LLC*, No. SJC-13906 (Mass. Apr. 24, 2026). In April 2026, the Attorney General led thirty-nine other States and the District of Columbia in telling the CFTC that "[u]nlicensed, unregulated, and untaxed 'sports event contracts' offered on DCMs are per se unlawful activity under" state gambling laws, including Ohio's, because "[t]raditional sports bets and sports-related event contracts offered on designated contract markets . . . have no meaningful differences,"[11] and

[11] Comment Letter of the Attorneys General of Ohio, Nevada, New Jersey, New York, Tennessee, Utah, 34 Other States, and the District of Columbia on Prediction Markets at 2, 15, 17 (Apr. 30, 2026), https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/2026-4-30-CFTC-Comment-Letter.aspx.

in July 2026 Defendant Wilson led forty-four State Attorneys General in telling the CFTC that "States have long regulated gambling—including sports bets. The federal government has not."[12]

83. Defendants are clearly poised to apply their theory, and attempt to enforce state gambling laws, against any sports-related event contracts Underdog offers in the state. Underdog has received no assurance that Defendants will not enforce Ohio law against it.

### J. The CFTC Has Made Clear That Compliance With Ohio's Demands Violates The CEA's Core Principles.

84. As required by the CEA, the CFTC has adopted regulations setting out these "Core Principles," which DCMs must follow. One such regulation, Core Principle 2, requires DCMs to offer "impartial access" to their markets and services to users across the country. *See* 17 C.F.R. § 38.151(b). In its amicus brief supporting Kalshi in the Sixth Circuit, the CFTC explained that "compliance is impossible because a DCM is required by federal law to provide 'impartial access to its markets and services' to all its 'members,'" and that "[i]f state gambling laws cover event contracts, . . . then DCMs will only be able to offer those contracts in States that do not seek to prohibit them" which violates the "impartial" and "non-discriminatory" access requirements. CFTC Sixth Circuit Brief at 29-30 (citing 17 C.F.R. § 38.151(b)). It further explained that "[i]f states could prosecute DCM operators for offering event contracts, the operators would face the prospect of fifty different regulators, each capable of restricting which contracts may be listed on each exchange." *Id.* at 25.

85. The CFTC has made clear that compliance with state enforcement actions would violate the Core Principles, bringing DCMs out of compliance with their obligations under the CEA. For instance, on August 11, 2026, the CFTC issued an emergency order directing Kalshi

---

[12] Comment Letter of the Attorneys General of Ohio and 43 Other States on Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (July 27, 2026), https://www.regulations.gov/comment/CFTC-2026-1189-0174.

and its affiliates to continue to perform its functions as an exchange in response to New York's ongoing enforcement action against Kalshi.[13] The CFTC stated that compliance with New York's proposed TRO, if granted, would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" *Id*. at 8-9 (citing 7 U.S.C. §§ 7(d)(4), 7(d)(9)). Similarly, on July 14, 2026, in response to a state court decision ordering Kalshi to "void[], cancel[], and refund[]" trades entered into by Kalshi traders located in Michigan, the CFTC issued an Order directing Kalshi to "fulfill the open trades in question as it would in the ordinary course of business."[14] The CFTC found that the Michigan court's "unprecedented order" constitutes a "'major market disturbance which prevents the market from accurately reflecting the forces of supply and demand' with respect to event contracts" and that "forced liquidation of trades will cause distortions" which "would, among other things, violate CEA Core Principle 4, which requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process." *Id*. at 6-8. The CFTC's directives in its orders, both in New York and Michigan, would apply to Underdog with equal force here and nationwide.

---

[13] Order Directing Kalshi to Continue Exercising DCM Functions at 9, In the Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration, CFTC (August 11, 2026), https://www.cftc.gov/PressRoom/PressReleases/9281-26 (hereinafter "New York CFTC Order").

[14] CFTC Order Staying Emergency Rule Filed by KalshiEX LLC, and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents, In re Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration and Emergency Rule Filing Pursuant to Commission Regulation 40.6(a), CFTC (July 14, 2026), https://www.cftc.gov/filings/documents/2026/orgcftcorderstayingkalem61407.pdf (hereinafter "Michigan CFTC Order").

### K. Defendants' Anticipated Enforcement Against Underdog Will Irreparably Harm Underdog and Preclude Its Ability to Comply With Federal Regulations.

86. The threat of enforcement against Underdog is real, imminent, and concrete. Given Ohio's definitive position on prediction markets—which has already produced cease-and-desist demands to three CFTC-registered firms, a warning to its own licensees, and a $5,000,000 penalty proceeding against a CFTC-designated contract market—there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject Underdog and its customers to irreparable harm. *See Morales*, 504 U.S. at 381 (no adequate remedy at law where attorneys general had "made clear" they would seek to enforce state law and thus "enforcement actions [were] imminent"). The prospect of an imminent enforcement action leaves Underdog with a "Hobson's choice" wherein both its options are certain to cause irreparable harm: either Underdog can "suffer the injury of obeying [Ohio's] law" despite the fact that it is preempted, or it can continue to operate in Ohio, "expos[ing] [itself] to potentially huge liability." *Morales*, 504 U.S. at 381.

87. If Underdog complies with Ohio's wrongful assertion of its authority over DCMs by ceasing to offer event contracts in Ohio, it will violate the CFTC's Core Principles, bringing Underdog out of compliance with its obligations under the CEA. *See supra* § J. Indeed, in response to state enforcement actions against Kalshi, the CFTC stated that compliance with state demands to cease operations would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" New York CFTC Order at 8-9 (citing 7 U.S.C. §§ 7(d)(4), 7(d)(9)). Similarly, in response to Kalshi's notification that it planned to liquidate open derivative positions to comply with a state court order

in Michigan, the CFTC stated that such a plan would "violate CEA Core Principle 4." Michigan CFTC Order at 8.

88. Compliance with Ohio's demands would also be extremely costly and would cause reputational and competitive injury, particularly damaging to such a new DCM fighting for market share. Any economic losses Underdog incurs from ceasing operations would be unrecoverable because sovereign immunity bars recovery for monetary damages, causing Underdog irreparable harm. *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999); *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) ("complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs" (citation omitted)); *NetChoice, LLC v. Skrmetti*, No. 25-5660, slip op. at 9-11 (6th Cir. Aug. 28, 2026) (district court abused its discretion by "discredit[ing] outright assertions of irreparable harm from unrecoverable compliance costs"); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (per curiam) (although "the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped'"). The Sixth Circuit has already recognized as much in this very context, acknowledging that a DCM forced to geofence Ohio "likely could not recover its costs from Ohio even if successful in this litigation." *Schuler*, 2026 WL 1295806, slip op. at 14.

89. Further, Underdog cannot avoid irreparable harm by submitting to Ohio's sports gaming licensing regime. As a federally regulated DCM and FCM, applying for a state license to offer event contracts in Ohio would require Underdog to ignore the law—which mandates that Underdog obtain federal, not state, approval to operate—and abandon the federal rights it has obtained through its successful application to the CFTC for designation. Nor is an Ohio license

any guarantee: type A licenses are capped, reserved by preference for professional sports organizations, casino operators, and video lottery sales agents, and conditioned on maintaining a staffed place of business in Ohio, R.C. 3775.04(A)(2)(a), (A)(3), 3775.041(A), and any other company may offer online sports gaming only as a "mobile management services provider" operating "on behalf of" an Ohio sportsbook under a Commission-approved contract, R.C. 3775.01(G)(1), 3775.05. *See supra* ¶ 74. And even under a license, Ohio law would confine Underdog's markets to persons "physically located in this state," R.C. 3775.11(A), and to "system[s] or method[s] of wagering" the Commission chooses to approve, R.C. 3775.01(O)(2), depriving those markets of the nationwide liquidity on which they depend and violating the CEA's requirement that a DCM provide "impartial access" to all eligible participants. *See* 17 C.F.R. § 38.151(b).

90. On the other hand, if Underdog refuses to acquiesce to Ohio's wrongful position, it will almost certainly become subject to enforcement efforts, as shown by Ohio's cease-and-desist demands to Kalshi, Robinhood, and Crypto.com, its pending penalty proceeding against Kalshi, its warning to its own licensees, Defendants' roles in enforcing Ohio gambling and sports gaming law, and Defendants' public statements committing to continue enforcing state law against prediction markets. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *Kiser v. Reitz*, 765 F.3d 601, 608-09 (6th Cir. 2014) (Ohio regulatory board's warning letters established a credible threat of enforcement); *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016) (credible threat shown by "a history of past enforcement against the plaintiffs or others" and "enforcement warning letters sent to the plaintiffs regarding their specific conduct").

91. Nor would an Ohio license shield Underdog from that enforcement. The Commission has told its licensees that sporting event contracts offered through a DCM or FCM "outside of the four corners of an existing sporting gaming license in Ohio" are "unlawful and unlicensed sports gaming," Licensee Letter at 1 n.1, and that it may pursue "additional civil and administrative remedies" not only against the offending company but against "its officers, directors, holding or parent companies," Kalshi C&D at 2.

92. The Commission moved against Kalshi after Kalshi self-certified and listed sports-related event contracts that were available to persons in Ohio through Kalshi's website and mobile application, asserting that Kalshi "has operated or conducted sports gaming in Ohio without a license." Complaint ¶ 43, *KalshiEX LLC v. Morrison*, No. 26 CV 006013 (Ohio Ct. Com. Pl., Franklin Cnty. June 29, 2026); *see also* Kalshi C&D at 1. Just like Kalshi, Underdog lists sports-related event contracts on its CFTC-designated contract market and makes them available to users through a mobile application and an internet website,[15] and, through its CFTC-registered FCM, intermediates its customers' transactions in event contracts listed on other DCMs, including Kalshi.

93. The penalties for Underdog's non-compliance with an inapplicable state regulatory regime will be significant, and may be both criminal and civil. The Commission has already told Kalshi that offering sports gaming without a license is a "felony," that its website "constitutes a nuisance under Ohio law that is subject to abatement under R.C. Chapter 3767," and that the Commission may impose "a civil penalty or fine in an amount equal to the money or value of the property that Kalshi has unlawfully obtained or retained." Kalshi C&D at 1-2. Under Ohio law, operating sports gaming without a Commission license is a felony of the fifth degree on a first

15 Underdog, underdogsports.com.

offense and a felony of the fourth degree thereafter, punishable by up to twelve and eighteen months' imprisonment, respectively, and, for an organization, fines of up to $7,500 and $10,000 per offense. R.C. 3775.99(B)(9), 2929.14(A)(4)-(5), 2929.31(A)(6)-(7). Gambling and operating a gambling house are misdemeanors of the first degree, and felonies of the fifth degree for repeat offenders, R.C. 2915.02(K), 2915.03(B); knowingly permitting a person under twenty-one to engage in sports gaming carries the same penalties, R.C. 3775.99(A)(2); and the website through which unlicensed sports gaming is offered is a nuisance subject to abatement, R.C. 3775.99(B)(9), 2915.03(C). The Commission may separately impose administrative fines and civil penalties that Ohio law does not cap—including a penalty "equal to the money or value of the property that was unlawfully obtained or retained," Ohio Adm. Code 3775-1-08(D)—and it has already demanded $5,000,000 from Kalshi. *See supra* ¶ 79.

94. The relief Defendants seek against Kalshi confirms the severity of the threat: a $5,000,000 penalty for the mere act of listing federally certified contracts for persons in Ohio, a figure the Commission has since defended as the licensing fees "that Kalshi and others should have paid had it operated with a license." Memorandum in Opposition to Motion for Preliminary Injunction at 7-8, *KalshiEX LLC v. Morrison*, No. 26 CV 006013 (Ohio Ct. Com. Pl., Franklin Cnty. Aug. 14, 2026). That penalty is backed by the threat of criminal prosecution and abatement of Kalshi's website as a nuisance. *See supra* ¶¶ 72, 75. Such enforcement would bar a federally designated exchange from listing, matching, or settling federally certified contracts for any person in Ohio. As the CFTC found in the analogous context of New York's enforcement action against Kalshi, such an assertion of state authority "cuts at the very heart of the Commission's jurisdiction and would have significant adverse ramifications for national and international financial markets," New York CFTC Order at 5, and permitting it to proceed would mean "a single State will

effectively become the nationwide regulator of event-contract swaps on DCMs" and "threaten[] to unsettle derivatives markets generally." *Id.* at 5, 9.

95. Accordingly, Underdog has no plain, speedy, or adequate remedy at law to address the wrongs described herein and thus seeks injunctive and declaratory relief.

**COUNT I**

**(Declaratory and Injunctive Relief: Express Preemption – Against All Defendants)**

96. Plaintiffs incorporate all prior paragraphs by reference.

97. The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

98. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly reserved exclusive authority to the federal government.

99. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Ohio law, and without regard to whether Defendants have correctly interpreted Ohio law, Ohio law is preempted pursuant to the Supremacy Clause. Congress has expressly reserved exclusive authority over trading on federally regulated derivatives markets by giving the CFTC "exclusive jurisdiction" to regulate derivatives trading on approved exchanges and thus to determine whether trading in particular event contracts is permitted. 7 U.S.C. § 2(a)(1)(A). Granting exclusive jurisdiction to the CFTC aligned with Congress' intent in enacting the CEA, which focused on establishing a unified approach to derivatives regulation and preventing patchwork state regulation, which Congress believed would lead to "total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

100. Courts nationwide have agreed that Congress intended to preempt state law in derivatives trading on CFTC-regulated exchanges. *See, e.g.*, *Flaherty*, 172 F.4th at 228; *United States & CFTC v. Minnesota*, No. 26-cv-2661 (KMM/DTS), 2026 WL 2150211, at *9-11, 13 (D. Minn. July 27, 2026); Order at 2-3, *KalshiEX LLC v. Johnson*, No. 2:26-cv-01715 (D. Ariz. Apr. 10, 2026), ECF No. 65; *KalshiEX LLC v. Orgel*, No. 3:26-CV-00034, 2026 WL 474869, at *9-10 (M.D. Tenn. Feb. 19, 2026); *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003); *Am. Agric. Movement*, 977 F.2d at 1156; *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979); *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

101. To the extent that Ohio is attempting to enforce its laws—including the Sports Gaming Act, R.C. Chapter 3775 (including R.C. 3775.02, 3775.03, and 3775.99); the gambling provisions of the Criminal Code, R.C. Chapter 2915 (including R.C. 2915.02 and 2915.03); the nuisance provisions of R.C. Chapter 3767; and any rules adopted thereunder, including Ohio Adm. Code Chapter 3775-1 (collectively, the "challenged provisions")—against federally regulated derivatives markets, Ohio's enforcement is preempted. By threatening to enforce those or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

102. Therefore, Defendants may not enforce Ohio's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

103. As a result, Underdog is entitled to a declaratory judgment under 28 U.S.C. § 2201 that Ohio's gaming laws, as applied to Underdog's designated contract market and its involvement in transactions on designated contract markets, are expressly preempted by the CEA and CFTC regulations and violate the Supremacy Clause, and to permanent injunctive relief under 28 U.S.C. § 2202 and Fed. R. Civ. P. 65 barring Defendants from enforcing them against Underdog.

**COUNT II**

**(Declaratory and Injunctive Relief: Field Preemption – Against All Defendants)**

104. Plaintiffs incorporate all prior paragraphs by reference.

105. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has adopted a comprehensive regulatory scheme, thus occupying the field for regulation.

106. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Ohio law, and without regard to whether Defendants have correctly interpreted Ohio law, Ohio law is preempted pursuant to the Supremacy Clause.

107. As courts have recognized, "the CEA is recognized as establishing 'a comprehensive system for regulating futures contracts and options'" that grants the CFTC exclusive jurisdiction. *See, e.g.*, *CFTC v. Reed*, 481 F. Supp. 2d 1190, 1194-95 (D. Colo. 2007) (quoting *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993)). That system includes creating the CFTC and vesting it with exclusive authority to regulate derivatives trading, including event contracts. *See* 7 U.S.C. §§ 1 *et seq.*

108. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-

2(c)(5)(C)(i)—authority that leaves no room for parallel state regulation over which event contracts can be restricted.

109. Because federal law occupies the entire field of regulating derivatives trading on regulated markets, enforcement of Ohio's state laws against federally regulated derivatives markets is field-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 228-29. Accordingly, by threatening to enforce the statutes referenced at ¶ 102 or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

110. Therefore, Defendants may not enforce Ohio's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

111. As a result, Underdog is entitled to a declaratory judgment under 28 U.S.C. § 2201 that Ohio's gaming laws, as applied to Underdog's designated contract market and its involvement in transactions on designated contract markets, are field preempted by the CEA and CFTC regulations and violate the Supremacy Clause, and to permanent injunctive relief under 28 U.S.C. § 2202 and Fed. R. Civ. P. 65 barring Defendants from enforcing them against Underdog.

**COUNT III**

**(Declaratory and Injunctive Relief: Conflict Preemption – Against All Defendants)**

112. Plaintiffs incorporate all prior paragraphs by reference.

113. The Supremacy Clause mandates that federal law preempts state law where compliance with the state law would conflict with federal law.

114. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder conflict with Ohio law, and without regard to whether Defendants have correctly interpreted Ohio law, Ohio law is preempted pursuant to the Supremacy Clause.

115. Defendants' attempts to ban and/or regulate event contracts that federal law and the CFTC have authorized plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. For that reason among others, the threatened actions are conflict-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 229-30.

116. By threatening to enforce the statutes referenced in ¶ 102 or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

117. Therefore, Defendants may not enforce Ohio's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

118. As a result, Underdog is entitled to a declaratory judgment under 28 U.S.C. § 2201 that Ohio's gaming laws, as applied to Underdog's designated contract market and its involvement in transactions on designated contract markets, conflict with the CEA and CFTC regulations, are therefore preempted, and violate the Supremacy Clause, and to permanent injunctive relief under 28 U.S.C. § 2202 and Fed. R. Civ. P. 65 barring Defendants from enforcing them against Underdog

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. Enter a declaratory judgment under 28 U.S.C. §§ 2201-2202 stating that the challenged provisions, or any other state laws pertaining to gambling or wagering, as applied to Underdog's designated contract market and its involvement in transactions on designated contract markets, violate the Supremacy Clause and are therefore preempted and unconstitutional;

2. Issue a permanent injunction enjoining Defendants, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them who receive actual notice of the order, from enforcing the challenged provisions or any other state laws pertaining to gambling or wagering, as applied to Underdog's designated contract market and its involvement in transactions on designated contract markets;

3. Award any other relief within this Court's discretion that it deems just and proper.

Dated: September 8, 2026

*/s/ Jon W. Groza*
Jon W. Groza (OSBA No. 83985)
KOHRMAN JACKSON & KRANTZ LLP
One Cleveland Center, 29th Floor
Cleveland, Ohio 44114
Telephone: (216) 736-7255
Facsimile: (216) 621-6536
JWG@kjk.com

Robert A. Fumerton
(seeking *pro hac vice* admission)
David Meister
(seeking *pro hac vice* admission)
Judith A. Flumenbaum
(seeking *pro hac vice* admission)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
robert.fumerton@skadden.com
david.meister@skadden.com
judy.flumenbaum@skadden.com

*Attorneys for Plaintiffs Underdog Exchange DCM, Inc. and UDM, LLC d/b/a Underdog Predict*